(No. 92963.—

JACK CAVENEY *et al.*, Appellees, v. GLEN L. BOWER, Director of Revenue, *et al.*, Appellants.

*Opinion filed May 8, 2003.—Rehearing denied September 29, 2003.*

FREEMAN, J., joined by McMORROW, C.J., and KILBRIDE, J., specially concurring.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and A. Benjamin Goldgar, Assistant Attorney General, of Chicago, of counsel), for appellants.

Richard A. Hanson and Theodore R. Bots, of McDermott, Will & Emery, of Chicago, for appellees.

Gino L. DiVito, Michael I. Rothstein and Michael Grant, of Tabet, DiVito & Rothstein, L.L.C., of Chicago, for *amicus curiae* Appellate Lawyers Association.

JUSTICE THOMAS delivered the opinion of the court:

Plaintiffs, Jack and Margaret Caveney, are shareholders in Panduit Corporation. For the tax years ending December 31, 1993, 1994, and 1995, Panduit elected to be treated as a subchapter S corporation for federal and state tax purposes. During the tax years in question, plaintiffs claimed a credit against their Illinois income tax liability, pursuant to section 201(k) of the Illinois Income Tax Act (the Act) (35 ILCS 5/201(k) (West 1996)), for research and development expenditures incurred by Panduit. The State disallowed the claims and calculated back taxes and interest in the amount of $1,091,131.60, which plaintiffs paid under protest.

Seeking a return of the amounts paid under protest, plaintiffs filed suit under the State Officers and Employees Money Disposition Act (30 ILCS 230/1 *et seq.* (West 2000)). Plaintiffs first argued that they qualified for the

tax credit under the version of section 201(k) that was in force during the tax years in question. In the alternative, plaintiffs argued that, if they did not so qualify, section 201(k) violated the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2). The circuit court of Du Page County agreed with both of plaintiffs' arguments and entered summary judgment in plaintiffs' favor. The State appealed.

Before the appellate court, plaintiffs not only repeated their previous arguments but also argued for the first time that they qualified for the research and development tax credit under a 1999 amendment to section 201(k), which was enacted as part of Public Act 91—644 (Pub. Act 91—644, eff. August 20, 1999). The appellate court affirmed solely on the basis of the 1999 amendment. Citing this court's decision in *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282 (1996), the appellate court explained that retroactive application of the 1999 amendment was appropriate because the State had failed to identify any "vested right" that would be compromised by such an application.

The State filed a petition for leave to appeal (177 Ill. 2d R. 315(a)), and this court issued a supervisory order vacating the appellate court's judgment and remanding the cause for reconsideration in light of *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 37 (2001). *Caveney v. Bower*, 195 Ill. 2d 549 (2001) (supervisory order). On remand, and with one justice dissenting, the appellate court again affirmed the entry of summary judgment in plaintiffs' favor. 326 Ill. App. 3d 1. We granted the State's petition for leave to appeal. 177 Ill. 2d R. 315(a).

## ANALYSIS

### Motion to Strike

At the outset, we must address plaintiffs' motion to

strike certain portions of the State's opening brief. In that brief, the State argued not only that the 1999 amendment to section 201(k) does not apply retroactively but also that (1) plaintiffs do not qualify for the research and development tax credit under the previous version of section 201(k), and (2) the previous version of section 201(k) does not violate the uniformity clause of the Illinois Constitution. Citing Supreme Court Rule 315(b)(3) (177 Ill. 2d R. 315(b)(3)), plaintiffs argue that we must strike those portions of the State's brief that address the latter two arguments, as those arguments were neither addressed by the appellate court nor asserted in the State's petition for leave to appeal as a basis for reversing the appellate court's judgment.

Plaintiffs' motion is utterly without merit. First, the State clearly preserved these issues for review. The contested arguments were fully briefed and argued in both the trial court and the appellate court. The appellate court's decision to affirm on other grounds does not amount to a procedural default by the State. Second, the State could not have asserted the contested arguments as a basis for reversing the appellate court's judgment because, as plaintiffs concede in their motion, the appellate court did not reach these issues. Although these issues formed the basis for the trial court's decision, the appellate court affirmed on a wholly different basis, namely, the retroactive application of the 1999 amendment. Given that the retroactive application of the 1999 amendment was the only issue addressed in the appellate court's decision, it is only natural that that issue constituted the State's sole basis for reversing that decision. Finally, and contrary to representations contained in plaintiffs' motion, the State *did* raise the contested arguments in its petition for leave to appeal. The following footnote appears on page 15 of the State's petition for leave to appeal:

"The Caveneys, of course, have maintained that they were entitled to the tax credits even under the pre-amendment version of section 201(k). The petitioners have taken the opposite position. The appellate court has never reached the issue, twice deciding the case on the ground that the 1999 amendment was retroactive. *If this court grants leave to appeal, the petitioners would naturally raise the tax issue in addition to the issue of retroactivity. The petitioners do not raise the tax issue as a ground for leave to appeal because the appellate court never decided the issue.*" (Emphasis added.)

In this footnote, the State did all it reasonably could be expected to do with respect to the contested arguments, which were unavailable to the State as bases for *reversing* the appellate court's judgment yet remained wholly available to plaintiffs as bases for *affirming* the appellate court's judgment. See *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 281 (2002) (appellate court's judgment may be affirmed on any basis in the record). Plaintiffs' motion to strike is denied.

Section 201(k): Original Version

Turning to the merits, we first address whether plaintiffs qualify for the research and development tax credit under the version of section 201(k) that existed prior to the 1999 amendment. Relying upon the statute's plain language, the State insists that, as Panduit's shareholders, plaintiffs may not personally claim a tax credit for research and development expenses actually incurred by Panduit. Plaintiffs counter that, given both the nature of subchapter S corporations and the clear public policy underlying section 201(k), the legislature must have intended to make the research and development tax credit available to S corporation shareholders. We agree with the State.

The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Michi-*

*gan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). The construction of a statute is a question of law that is reviewed *de novo. In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000).

Prior to the 1999 amendment, section 201(k) provided:

> "Beginning with tax years ending after July 1, 1990, a taxpayer shall be allowed a credit against the tax imposed by subsections (a) and (b) of this Section for increasing research activities in this State. The credit allowed against the tax imposed by subsections (a) and (b) shall be equal to $6^{1}/2\%$ of the qualifying expenditures for increasing research activities in this State." 35 ILCS 5/201(k) (West 1998).

For purposes of section 201(k), "qualifying expenditures" are defined as "the qualifying expenditures as defined for the federal credit for increasing research activities which would be allowable under Section 41 of the Internal Revenue Code and which are conducted in this State." 35 ILCS 5/201(k) (West 1998). Section 41 of the Internal Revenue Code, in turn, defines "qualified research expenses" as those that "are paid or incurred *by the taxpayer* during the taxable year in carrying on any trade or business of the taxpayer." (Emphasis added.) 26 U.S.C. § 41(b)(1) (2000). The "tax imposed by subsections (a) and (b)" is the Illinois income tax. 35 ILCS 5/201(a), (b) (West 1998).

We find no ambiguity in the foregoing statute and conclude that plaintiffs are ineligible for the research and development tax credit that existed prior to the 1999 amendment. Prior to that amendment, section 201(k)

authorized a credit only against the taxpayer's Illinois income tax liability and only for research and development expenses actually incurred by the taxpayer. Here, there is no question that the expenses in question were incurred by Panduit and not by plaintiffs personally. Panduit, however, may not claim a credit for these expenses, as Panduit is a subchapter S corporation and therefore exempt from the Illinois income tax. See 35 ILCS 5/205(c) (West 2000). By the same token, plaintiffs are ineligible for the credit because, although they are subject to the Illinois income tax, they did not personally incur the expenses. To be sure, had plaintiffs personally incurred any qualifying expenses during the years in question, they could have claimed a credit for those expenses in accordance with section 201(k). What plaintiffs could *not* do, however, is claim a credit against their personal income tax liability for qualifying expenses incurred by a third party, even if that third party was an S corporation of which plaintiffs are shareholders.

This conclusion is supported by the fact that, when the legislature originally enacted section 201(k) in 1990, section 201 already included two tax credit provisions that *did* authorize S corporation shareholders to claim a credit against their personal Illinois income tax liability for expenses incurred by the S corporation. Section 201(f)(1), which establishes an income tax credit for investments in designated "Enterprise Zones," specifically provides that:

> "For *** shareholders of Subchapter S corporations[ ] there shall be allowed a credit under this subsection (f) to be determined in accordance with the determination of income and distributive share of income under Sections 702 and 704 and Subchapter S of the Internal Revenue Code." 35 ILCS 5/201(f)(1) (West 1992).

Section 201(j), which authorizes an income tax credit for certain educational and vocation training expenses, contains the identical pass-through provision. 35 ILCS

5/201(j) (West 1992). Significantly, sections 201(f)(1) and 201(j) were enacted five years prior to the enactment of section 201(k). Conversely, even *after* enactment of the 1999 amendment to section 201(k), section 201 continues to include tax credit provisions that do *not* include pass-through provisions. See, *e.g.*, 35 ILCS 5/201(h), (l) (West 2000). Of course, it is well established that, when the legislature uses certain language in one part of a statute and different language in another, this court will presume that different results were intended. *In re K.C.*, 186 Ill. 2d 542, 549-50 (1999). Thus, we may presume that the legislature's failure to include a pass-through provision in the original version of section 201(k) was deliberate, and that the original version of section 201(k) was never meant to apply to S corporation shareholders. Moreover, were we to agree with plaintiffs and hold that section 201(k)'s tax credit passed through to S corporation shareholders even before the 1999 amendment, the pass-through provisions contained in sections 201(f)(1) and 201(j) would be rendered "meaningless surplusage." We therefore will not adopt such a reading. See *In re K.C.*, 186 Ill. 2d at 550.

### Section 201(k): Amended Version

We next consider whether plaintiffs qualify for the research and development tax credit under the 1999 amendment to section 201(k). Under that amendment, which was enacted as part of Public Act 91—644 (Pub. Act 91—644, eff. August 20, 1999), the legislature added the following pass-through provision to section 201(k), thereby specifically extending section 201(k)'s benefits to S corporation shareholders:

> "For partners, shareholders of subchapter S corporations, and owners of limited liability companies, if the liability company is treated as a partnership for purposes of federal and State income taxation, there shall be allowed a credit under this subsection to be determined in accordance with

the determination of income and distributive share of income under Sections 702 and 704 and subchapter S of the Internal Revenue Code." 35 ILCS 5/201(k) (West 2000). Plaintiffs insist that, although this amendment was enacted in 1999, it nevertheless applies retroactively because the State does not a possess a "vested right" to collect taxes owed under the prior version of the law. The State disagrees, arguing that, under this court's recent decision in *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27 (2001), retroactive application of the amendment is prohibited because such an application would attach new legal consequences to previously completed acts. We agree with the State, but we do so for different reasons.

In *Commonwealth Edison*, this court for the first time adopted the United States Supreme Court's retroactivity analysis, as set forth in *Landgraf v. USI Film Products*, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). Under the *Landgraf* analysis, as adopted by this court, the first question is whether the legislature has clearly indicated the temporal reach of an amended statute. *Commonwealth Edison*, 196 Ill. 2d at 38. If so, then, absent a constitutional prohibition, that expression of legislative intent must be given effect. *Commonwealth Edison*, 196 Ill. 2d at 38. If not, then the court must determine whether applying the statute would have a retroactive impact, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Commonwealth Edison*, 196 Ill. 2d at 38. If there would be no retroactive impact, then the amended law may be applied retroactively. *Commonwealth Edison*, 196 Ill. 2d at 38. If there *would* be a retroactive impact, however, then the court must presume that the legislature did not intend that it be so applied. *Commonwealth Edison*, 196 Ill. 2d at 38.

As it turns out, despite the analytical challenges typi-

cally posed by a phrase like "retroactive impact," application of the *Landgraf* approach in Illinois should prove uneventful. This is because, as this court recently acknowledged in *People v. Glisson*, 202 Ill. 2d 499 (2002), the legislature has clearly indicated the "temporal reach" of *every* amended statute. In section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2000)), which this court describes as "the general saving clause of Illinois" (*Glisson*, 202 Ill. 2d at 505), the legislature mandated that:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding." 5 ILCS 70/4 (West 2000).

In *Glisson*, this court construed the foregoing language as authorizing the "retroactive application of amendments or repeals in criminal statutes *** only if such changes are procedural in nature." *Glisson*, 202 Ill. 2d at 507. Conversely, section 4 "forbids retroactive application of substantive changes to statutes." *Glisson*, 202 Ill. 2d at 507. Thus, section 4 represents a clear legislative directive as to the temporal reach of statutory amendments and repeals: those that are procedural in nature may be applied retroactively, while those that are substantive may not.

Of course, in *Glisson*, we spoke only of "amendments or repeals in *criminal* statutes" (emphasis added) (*Glisson*, 202 Ill. 2d at 507), whereas the present case is clearly a civil matter. This is of no consequence, however, as nothing on the face of section 4 confines its application

to criminal statutes.[1] More importantly, this court has never hesitated to utilize section 4 in ascertaining the temporal reach of a civil statute. In fact, in a case nearly identical to the present appeal, this court held that section 4 precludes the retroactive application of a recently enacted tax benefit, as such a measure is clearly substantive in nature. See *Connell v. Crosby*, 210 Ill. 380 (1904).

In *Connell*, the decedent's will provided that a certain portion of his estate be devoted to the founding of a college. At the time of the decedent's death in 1897, bequests for educational purposes were subject to the Illinois inheritance tax. In 1901, and before a petition for the collection of decedent's estate taxes had been filed, the legislature amended the Inheritance Tax Act to exempt bequests for educational purposes. In rejecting the executor's argument that the 1901 exemption should apply retroactively to the decedent's educational bequest, this court explained:

"The amendatory act of 1901 does not, in terms, repeal the former act. It contains no saving clause, nor does it in terms purport to affect, in any way, any right, whether vested or inchoate, which might then exist. Section 4 of chapter 131 (Hurd's Stat. 1899, p. 1650) furnishes the guide for determining the effect to be given the amendatory enactment. That section provides: 'No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any *** right accrued or claim arising under the former law, or in any way whatever to affect *** any right accrued or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the

---

[1]To be sure, in West's edition of the Illinois Compiled Statutes section 4 bears the title, "Rights, etc., saved—*Criminal cases*—Application of new law by consent." (Emphasis added.) 5 ILCS 70/4 (West 2000). This title, however, represents an unofficial, publisher-generated caption and therefore is wholly irrelevant in construing the scope of section 4. See *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 506 (2000).

laws in force at the time of such proceedings.' It is to be assumed the amendatory act was framed in view of the provisions of said section 4 of chapter 131, and that it was the legislative intent the amendatory act should have prospective operation, only. Statutes declaring the effect of or the construction to be given subsequently enacted repealing acts will be deemed operative and effective by the courts unless a contrary intent is plainly manifested in the later enactment. [Citations.] The right which accrued or the claim which arose to the tax, under the statute in force at the time of the death of the testator, was therefore unaffected, and remained enforcible notwithstanding the subsequent enactment exempting bequests for educational purposes from the tax. [Citations.]" *Connell*, 210 Ill. at 386-87.

Significantly, section 4 reads exactly the same today as it did on July 1, 1874, the day it was enacted.

In light of section 4, the *Landgraf* analysis in Illinois becomes quite simple. Indeed, with respect to a statutory amendment or repeal, it is virtually inconceivable that an Illinois court will ever go beyond step one of the *Landgraf* approach. Again, step one requires a court to ascertain whether the legislature has clearly indicated the temporal reach of the amended statute. *Commonwealth Edison*, 196 Ill. 2d at 38. If so, then, absent a constitutional prohibition, that expression of legislative intent must be given effect. Such was the case in *Commonwealth Edison*, where this court concluded that the amendatory act at issue contained an "unequivocal expression of legislative intent" authorizing retroactive application. *Commonwealth Edison*, 196 Ill. 2d at 42. If the amendatory act does *not* contain a clear indication of legislative intent, then "[i]t is to be assumed the amendatory act was framed in view of the provisions of said section 4." *Connell*, 210 Ill. at 386. Again, "[s]tatutes declaring the effect of or the construction to be given subsequently enacted repealing acts *will be deemed operative and effective by the courts* unless a contrary

intent is plainly manifested in the later enactment." (Emphasis added.) *Connell*, 210 Ill. at 387; see also *Commonwealth Edison*, 196 Ill. 2d at 38 ("if the legislature has clearly indicated what the temporal reach of an amended statute should be, then \*\*\* that expression of legislative intent must be given effect"). As *Glisson* teaches, section 4 represents a clear legislative indication that the retroactive application of substantive statutory changes is forbidden. Thus, for purposes of *Landgraf*'s first step, the legislature *always* will have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes.

Turning back to the question at hand, then, we must decide whether the 1999 amendment to section 201(k) may be applied retroactively to plaintiffs' 1993, 1994, and 1995 research and development expenditures. Our first task, of course, is to ascertain whether the legislature has clearly indicated the temporal reach of the 1999 amendment. See *Commonwealth Edison*, 196 Ill. 2d at 38. Unquestionably, it has. Unlike in *Commonwealth Edison*, however, the legislature's clear indication is not found in the amendatory act itself. Indeed, the 1999 amendment to section 201(k) specifically states that "[n]o inference shall be drawn from this amendatory Act \*\*\* in construing this Section for taxable years beginning before January 1, 1999." 35 ILCS 5/201(k) (West 2000). Rather, the legislature's clear pronouncement is found in section 4 of the Statute on Statutes, which "forbids retroactive application of substantive changes to statutes." *Glisson*, 202 Ill. 2d at 506-07. Clearly, the 1999 amendment to section 201(k) is a substantive change in the law, as it establishes an income tax credit for S corporation shareholders that previously did not exist. This being the case, "[i]t is to be assumed the amendatory act was framed in view of the provisions of said sec-

tion 4 ***, and that it was the legislative intent the amendatory act should have prospective operation, only." See *Connell*, 210 Ill. at 386-87.

## Uniformity Clause

Finally, we are asked to consider whether the version of section 201(k) that existed prior to the 1999 amendment violates the uniformity clause of the Illinois Constitution. See Ill. Const. 1970, art. IX, § 2. We hold that it does not.

The uniformity clause of the Illinois Constitution provides as follows:

"In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

In light of the foregoing language, we are hard pressed to identify even the basis for a uniformity challenge to the preamended version of section 201(k). The gravamen of a uniformity clause challenge is a classification, and the preamended version of section 201(k) contains no such thing. Prior to the 1999 amendment, section 201(k) granted *all taxpayers* subject to the income tax a credit for qualifying research and development expenditures incurred *by the taxpayer*. Such a credit is perfectly uniform. In fact, the first and only time a classification crept into section 201(k) was in 1999, when the legislature authorized only certain classes of Illinois income taxpayers to claim a credit for qualifying research and development expenditures incurred not by the taxpayer but *by a third party*. As this classification does not form the basis of the uniformity challenge in this case, however, we need not explore this issue any further.

## CONCLUSION

For the foregoing reasons, the judgments of the ap-

pellate court and the circuit court are reversed, and the cause is remanded to the circuit court with directions to enter summary judgment for the State.

*Judgments reversed;*
*cause remanded with directions.*

JUSTICE FREEMAN, specially concurring:

Although I agree with the result the court reaches, I write separately to note my disagreement with the analysis utilized with respect to whether amended section 201(k) applies retroactively to this case.

In *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27 (2001), this court adopted the retroactivity test developed by the United States Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). According to these cases, the first step in undertaking the retroactivity analysis is to determine whether the legislature has prescribed the statute's proper reach. If there is no legislative directive on the temporal reach of the statute, we must then establish whether the application of the statute to the conduct at issue would result in a retroactive effect. If so, then we must presume that the statute does not apply to that conduct. See *Commonwealth Edison*, 196 Ill. 2d at 38, citing *Landgraf*, 511 U.S. at 280, 128 L. Ed. 2d at 261-62, 114 S. Ct. at 1505.

Despite the fact that the United States Supreme Court has warned that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task" (*Landgraf*, 511 U.S. at 268, 128 L. Ed. 2d at 254, 114 S. Ct. at 1498), my colleagues today hold that, in Illinois, the task is indeed simple: "[A]pplication of the *Landgraf* approach *** should prove uneventful." 207 Ill. 2d at 92. This is so "because, as this court recently acknowledged in *People v. Glisson*, 202 Ill. 2d 499 (2002), the legislature has clearly indicated the 'temporal reach' of *every* amended statute." (Emphasis in original.) 207

Ill. 2d at 92. The legislature does so either expressly in the new legislative amendment or by default in section 4 of the Statute on Statutes, which serves, according to the court, as a "clear legislative directive as to the temporal reach of statutory amendments." 207 Ill. 2d at 92. The court concludes that "it is virtually inconceivable that an Illinois court will ever go beyond step one of the *Landgraf* approach." 207 Ill. 2d at 94. In this way, "for purposes of *Landgraf*'s first step, the legislature *always* will have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." (Emphasis in original.) 207 Ill. 2d at 95. I am wary of this expansive holding for several reasons, which I address *seriatum*.

As an initial matter, the application of section 4 of the Statute on Statutes to this case is not before us. The appellate court did not rely on the statute in reaching its conclusion, and none of the parties have ever argued that the statute has any bearing on this case. I further note that, even though we entertained oral argument in this case in November 2002 and our decision in *People v. Glisson*, 202 Ill. 2d 499 (2002), was handed down just weeks later, neither party has moved to cite *Glisson* as supplemental authority in this case. If *Glisson* holds that "the legislature has clearly indicated the 'temporal reach' of *every* amended statute," as the court says it does (emphasis in original) (207 Ill. 2d at 92), then I find it somewhat surprising that the case has not been cited to us, especially by the State, because it has been the position of both parties in this appeal that the legislature did *not* clearly express the temporal reach of the amended section 201(k).

Moreover, the attorneys representing both parties in this matter have prepared very thorough and comprehensive briefing, so I do not believe that the failure to cite

*Glisson* as supplemental authority was an oversight. Rather, I believe that the parties did not cite *Glisson* because, with all due respect to my colleagues in the majority, *Glisson* does not contain the statement that the court today says it contains, as a review of the case amply demonstrates. In *Glisson*, the defendant was convicted of chemical breakdown of illicit controlled substance pursuant to section 401.5(a—5) of the Illinois Controlled Substances Act. *Glisson*, 202 Ill. 2d at 501. Several weeks after the defendant's conviction was entered, the General Assembly added a subsection to the Illinois Controlled Substances Act that exempted the defendant's conduct from criminal liability. *Glisson*, 202 Ill. 2d at 501. In essence, the new subsection repealed the crime of which the defendant had been convicted. The question presented for this court was what effect, if any, the repealer had on the conviction. We held that section 4 "bars retroactive application of the statutory change repealing the offense of which defendant was convicted." *Glisson*, 202 Ill. 2d at 508. Our specific holding in *Glisson* was "retroactive application of amendments or repeals in criminal statutes is permissible only if such changes are procedural in nature." *Glisson*, 202 Ill. 2d at 507. In my view, our holding comports with the *second* prong of the *Landgraf* test, not the first, as the court today suggests.[2] Furthermore, we, in *Glisson*, did not intimate, in any way, that there existed a relationship between section 4 and the *Landgraf* test. Nor did we expressly hold that

---

[2]Our interpretation of section 4 in *Glisson* is consistent with this court's historical use of the statute. See *Merlo v. Johnston City & Big Muddy Coal & Mining Co.*, 258 Ill. 328, 338 (1913) (explaining that the doctrine of earlier cases, including *Connell v. Crosby*, 210 Ill. 380 (1904), was the "well established rule that no one has a vested right in a particular remedy or mode of procedure for the redress of grievances, and the legislature may change these, and the changed procedure may be applied to pending cases").

section 4 speaks to the temporal reach of every amendment.

More fundamentally, however, I believe the court errs when it holds that section 4 serves as the clear expression of legislative intent that is contemplated in the first step of the *Landgraf* analysis. Under *Landgraf*, the initial inquiry is fairly straightforward—did the legislative body identify, with clarity, the conduct, past or future, to which the newly enacted statute was to apply? Stated differently, we must ask whether the legislature expressed an intent that the statute be applied to events which occurred before the statute was enacted.[3] This inquiry must be distinguished from the second step of the analysis, which is whether the statute will have an impermissible retroactive impact or effect on past conduct. This comports with the Supreme Court's observation in *Landgraf*:

> "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment [citation] or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have 'sound ... instinct[s],' [citation] and familiar considerations of fair notice, reasonable reliance,

---

[3]In *Landgraf*, the Supreme Court gave an example of the type of language that might be used to convey such intent: "[T]he new provisions 'shall apply to all proceedings pending on or commenced after the date of enactment ***.' " *Landgraf*, 511 U.S. at 260, 128 L. Ed. 2d at 249, 114 S. Ct. at 1494.

and settled expectations offer sound guidance." *Landgraf*, 511 U.S. at 269-70, 128 L. Ed. 2d at 254-55, 114 S. Ct. at 1499.

I must point out that just because a newly enacted statute might reach back to antecedent events does not mean that the statute is impermissibly retroactive. Therefore, the first step of the *Landgraf* analysis is concerned with fixing the temporal reach of the statute while the second step, undertaken only if the temporal reach extends to past events, examines the impact the newly enacted statute will have on the past conduct. If that impact is "impermissibly retroactive," it will not be allowed. Section 4 of the Statute on Statutes does not expressly prescribe the temporal reach of every amendment in any way. Rather, the section is concerned with whether the new legislation will impact upon past conduct in an impermissibly retroactive manner.

In addition, I think it important to stress that the United States Supreme Court has not utilized the federal general savings statute (1 U.S.C. § 109 (2000)), a statute similar to our section 4, in cases where the language of the statute in question failed to denote legislative direction as to the temporal reach of a statute. In other words, the Supreme Court has not looked to the general savings statute as a "default" expression of legislative intent in cases where the language of the statute was silent as to temporal reach. The recent case *Immigration & Naturalization Service v. St. Cyr*, 533 U.S. 289, 150 L. Ed. 2d 347, 121 S. Ct. 2271 (2001), illustrates this point. In that case, St. Cyr, who had been admitted to the United States as a lawful permanent resident, pleaded guilty, in state court, to selling a controlled substance. The subsequent conviction on the charge made him eligible for deportation. However, at the time of his conviction, St. Cyr would have been eligible, under a section of the Immigration and Nationality Act, for a waiver of deportation at the discretion of the United States Attorney General. At the

time the removal proceedings had commenced against St. Cyr, the section of the Immigration and Nationality Act that had allowed for the waiver had been repealed and the Attorney General no longer possessed the discretion to waive the alien's deportation. St. Cyr petitioned for a federal writ of *habeas corpus*, alleging that, because he pleaded guilty before the waiver statute was repealed and the new legislation went into effect, the new legislation did not apply to him. The Immigration and Naturalization Service (INS) argued that the statute itself resolved the issue because its language unambiguously communicated Congress' intent to apply the new provisions to all removals initiated after the effective date of the statute.

In addressing these arguments, the Supreme Court noted that "the first step in determining whether a statute has an impermissible retroactive effect is to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316, 150 L. Ed. 2d at 372, 121 S. Ct. at 2288. The Supreme Court rejected the INS's arguments that the comprehensiveness of the legislation, its effective date, and the inclusion of a saving provision within the legislation itself dictated the temporal reach of the amendment in question. *St. Cyr*, 533 U.S. at 317-20, 150 L. Ed. 2d at 372-74, 121 S. Ct. at 2288-90. Critically, the Supreme Court did not resort to the federal general saving statute in the absence of the requisite clear expression of congressional intent. Rather, the Supreme Court "proceed[ed] to the second step of *Landgraf*'s retroactivity analysis in order to determine whether depriving removable aliens of consideration for [discretionary] relief produces an impermissible retroactive effect for aliens who, like respondent, were convicted pursuant to a plea agreement at a time when their plea would not have rendered them ineligible for [discretion-

ary] relief." *St. Cyr*, 533 U.S. at 320, 150 L. Ed. 2d at 374, 121 S. Ct. at 2290.

The Supreme Court's analysis in *St. Cyr* is instructive on the type of analysis a court is to employ in the first step of the *Landgraf* test. It would appear that a court is to focus on the language of the Act itself (*St. Cyr*, 533 U.S. at 317-19, 150 L. Ed. 2d at 372-73, 121 S. Ct. at 2288-89) and its legislative history (*St. Cyr*, 533 U.S. at 320 n.44, 150 L. Ed. 2d at 374 n.44, 121 S. Ct. at 2290 n.44). I note that the Supreme Court did not look to the federal savings statute after it determined that the language of the amendment was silent as to temporal reach. This suggests that a general savings statute, such as section 4, has little relevance in this step of the analytical process. In fact, my independent research has failed to unearth a single case in which a savings statute such as section 4 has been used in the manner advanced by the court today. This court adopted the *Landgraf* analysis in *Commonwealth Edison* just two years ago; however, the analysis has been applied in the federal courts since 1994. It would seem to me that if a general savings statute has the applicability to the analysis that the court posits here, some federal jurist would have noted it over the course of time. The fact that not one has done so, coupled with the inapplicability of *Glisson*, causes me to regard the broad conclusions reached today with a skeptical eye.

In view of the foregoing, I believe the better approach in this case is to apply the *Landgraf* test as suggested by the parties and in the manner set forth by the United States Supreme Court. As I noted previously, neither party contends that the General Assembly provided a clear expression of the temporal reach of the amended section 201(k). Indeed, it is difficult to argue to the contrary, as the amendment itself contains the following statement: "No inference shall be drawn from this

amendatory Act *** in construing this Section for taxable years beginning before January 1, 1999." 35 ILCS 5/201(k) (West 2000). I agree with the appellate court that this language is neutral—it indicates neither prospective nor retrospective application. 326 Ill. App. 3d at 4. In light of the fact that the General Assembly did not unambiguously direct that the amendment should be applied retroactively, the question becomes " 'whether the new statute would have retroactive effect' " if applied to past tax years. *Commonwealth Edison*, 196 Ill. 2d at 37, quoting *Landgraf*, 511 U.S. at 280, 128 L. Ed. 2d at 261-62, 114 S. Ct. at 1505. As we stated in *Commonwealth Edison*, " '[a] statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment [citation] or upsets expectations based in prior law.' " *Commonwealth Edison*, 196 Ill. 2d at 39, quoting *Landgraf*, 511 U.S. at 269, 128 L. Ed. 2d at 254-55, 114 S. Ct. at 1499. Instead, we " 'must ask whether the new provision attach[es] new legal consequences to events completed before its enactment.' " *Commonwealth Edison*, 196 Ill. 2d at 39, quoting *Landgraf*, 511 U.S. at 269-70, 128 L. Ed. 2d at 254-55, 114 S. Ct. at 1499.

After reviewing the arguments of the parties in this case, I believe that to grant a retroactive tax credit would "attach new legal consequences" to completed events. See *Commonwealth Edison*, 196 Ill. 2d at 39. Retroactive application of the amendment would give plaintiffs new rights to tax credits, take away the Department's old rights to tax revenues, and impose new obligations on the Department to refund taxes. As the United States Seventh Circuit Court of Appeals has recognized, "[c]hanging today's financial consequences of an earlier transaction is the paradigm of retroactivity." *Jahn v. 1-800 Flowers.com, Inc.*, 284 F.3d 807, 811 (7th Cir. 2002). Therefore, in the absence of a clear legislative indication

of retroactivity, I would employ the traditional presumption against retroactivity in this case.

CHIEF JUSTICE McMORROW and JUSTICE KILBRIDE join in this special concurrence.