# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-1633

IN RE:

RESOURCE TECHNOLOGY CORP.,

*Debtor.*

STATE OF ILLINOIS,

*Claimant-Appellant,*

*v.*

CHIPLEASE, INC.

*Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 4703—**Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 7, 2012—DECIDED JUNE 28, 2013

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* In 1987 the Illinois General Assembly enacted a program under which funds were made available to subsidize the development of certain power-generating facilities. The Public Utilities Act, 220 ILCS § 5/8-403.1 (the Act), required subsidized facilities to

repay these monies (which in substance were loans) as soon as they retired all of the capital costs or indebtedness incurred to develop the facility. In June 2006, the Act was amended to provide additional conditions that would trigger the obligation of a subsidized facility to repay its loans.

The question before us is whether these new conditions, which essentially provide additional grounds on which the state can demand repayment, can be applied retroactively. We find the answer in Illinois's Statute on Statutes, which guides the interpretation of all Illinois statutes and provides that laws apply prospectively absent a clear indication of retroactive temporal reach. *Caveney v. Bower*, 797 N.E.2d 596, 601-02 (Ill. 2003) (quoting 5 ILCS § 70/4). Because the 2006 amendment does not clearly indicate that the new repayment conditions apply to monies received prior to the amendment, we must construe the statute prospectively. This in turn leads us to affirm the district court's judgment.

# I

The program at issue was designed to encourage the development of power plants that convert solid waste to electricity. Public Utilities Act, 220 ILCS 5/8-403.1. Power plants were entitled to apply to the Illinois Commerce Commission (ICC) for designation as qualified solid waste energy facilities (Qualified Facilities). Qualified status brought along with it a significant commercial advantage: the ICC required local electric utilities to enter into ten-year agreements to purchase power from

the Qualified Facility at a rate exceeding the rate established under federal law. The state compensated electric utilities for these mandatory overcharges by allowing them to take a tax credit equal to the difference between the elevated price they paid for qualified electricity and the federal rate. Subsection (d) of the Act provided that a Qualified Facility became obliged to reimburse the state for the tax credits its customers had claimed, but this obligation arose only after the facility had repaid all of the capital costs it incurred for development and implementation of the plant.

Many Qualified Facilities failed before they repaid their capital costs. An important consequence of these failures was that Illinois never got its money back for the tax credits taken by the electric utilities that had bought power from the facility (implicitly, the loans to the Qualified Facility). This was seen as a problem, and so the Illinois General Assembly amended the Act effective July 1, 2006. Its aim was to terminate the Qualified Facility program and close what it saw as a serious loophole. The amendment establishes a moratorium on new Qualified Facilities, provides additional grounds for disqualifying facilities from the subsidy, and expands the conditions under subsection (d) that trigger a facility's liability to repay electric utilities' tax credits, adding the italicized language to the former law:

> Whenever a qualified solid waste energy facility has paid or otherwise satisfied in full the capital costs or indebtedness incurred in developing and implementing the qualified solid waste energy facility,

*whenever the qualified solid waste energy facility ceases to operate and produce electricity from methane gas generated from landfills, or at the end of the contract entered into pursuant to subsection (c) of this Section*, whichever occurs first, the [Qualified Facility] shall reimburse the Public Utility Fund and the General Revenue Fund in the State treasury for the actual reduction in payments to those Funds caused by this subsection (d).

220 ILCS 5/8-403.1(d) (emphasis added).

The events underlying this case began in 1997, when the ICC issued an order designating ten facilities owned by Resource Technology Corporation (RTC) as Qualified Facilities. The ICC then ordered Commonwealth Edison (ComEd), an electric utility, to sign three ten-year power purchase agreements with RTC; those agreements covered facilities at Lyons, Congress/Hillside, and Pontiac. Things did not go smoothly for long. In 1999, RTC's creditors filed an involuntary Chapter 7 bankruptcy petition against RTC; the trustees of its estate continued to operate its Qualified Facilities as a debtor-in-possession. (The case was converted to a Chapter 11 proceeding in January 2000, but it fell back into Chapter 7 status in 2005.) ComEd reported tax credits as compensation for purchasing electricity at the elevated Qualified-Facility rate from September 2005 until July 2006.

In 2005, RTC's trustee filed a suit against Chiplease (a debtor of RTC) and some others. The bankruptcy court approved a settlement of that case in 2006, under which Chiplease was assigned certain leases and executory

contracts. At that point, the trustee shut down the estate's operations at all three plants. Under other control, however, the facility at Pontiac continued to operate until July 2006; payments (at the retail rate) were sent to RTC's bankruptcy "lockbox."

Along with the assets, Chiplease acquired RTC's liability for the tax credits ComEd had taken to compensate it for buying Qualified-Facility power at inflated rates. On January 4, 2007, the State of Illinois filed an administrative expense claim against the estate for all of the tax credits ComEd took for power bought from RTC's Pontiac, Congress/Hillside, and Lyons facilities. As amended, the state sought a total of $1,518,048.72, plus another $14,358.82 for a separate tax-related claim that is not contested at this point. Since some of ComEd's purchases had occurred before the 2006 amendment and others after it, the bankruptcy court raised the question whether the amendment to the Act applies only prospectively (in which case Chiplease would have no duty to reimburse for credits taken before June 6, 2006) or retroactively (in which case it would be required to reimburse all credits). Ultimately, the bankruptcy court concluded that the Illinois Statute on Statutes, 5 ILCS § 70/4, requires the amendment to be construed prospectively. Based on that legal determination, the court held Chiplease liable only for the $175,710.58 in credits that ComEd took after the effective date of the amendment. The district court affirmed the bankruptcy court's ruling; it commented that "[h]ad the legislature intended otherwise, it could have said so in plain language."

## II

We review *de novo* the conclusions of law made by both the district court and the bankruptcy court. *Ojeda v. Goldberg,* 599 F.3d 712, 716 (7th Cir. 2010). And the only question before us is one of law: whether the 2006 amendment to the Act has retroactive effect. Under Illinois law, the answer depends on "whether the legislature has clearly indicated the temporal reach of an amended statute." *Caveney,* 797 N.E.2d at 601 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)); *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 483 (Ill. 2009) ("Illinois courts need never go beyond th[is] threshold step . . . because the legislature will always have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes."). Thanks to the Statute on Statutes, we know that "[i]f the amendatory act does *not* contain a clear indication of legislative intent, then it is to be assumed that the amendatory act was framed in view of the provisions of [5 ILCS § 70/4]." *Caveney,* 797 N.E.2d at 603 (emphasis in original) (internal quotation marks omitted).

A term in a statute is ambiguous "if it is capable of being understood by reasonably well-informed persons in two or more different ways." *Krohe v. City of Bloomington,* 789 N.E.2d 1211, 1213 (Ill. 2003). An act that "does not state whether it is to be applied retroactively or prospectively is ambiguous to that extent." *Randal v. Wal-Mart Stores, Inc.*, 673 N.E.2d 452, 455 (Ill. App. 1996). Illinois courts have found that an amend-

ment clearly indicates retroactive reach when a statutory provision specifically refers to actions or events taking place before enactment. *E.g., Lazenby v. Mark's Const., Inc.*, 923 N.E.2d 735, 743 (Ill. 2010) ("[T]he legislature clearly expressed its intent that the statute be given retroactive effect. [It] states that '[t]his Section applies to all causes of action that have accrued, will accrue, or are currently pending before a court . . . .'"); *Diocese of Dallas*, 917 N.E.2d at 483 ("[The statute] specifically provides that the 2003 amendment applies to actions pending when the changes took effect on July 24, 2003 . . . . By its terms, the amendment is not limited to situations where the events giving rise to the cause of action took place after the amendment's effective date."); *Allegis Realty Investors v. Novak*, 860 N.E.2d 246, 254 (Ill. 2006) ("[T]he new section 6-620 of the Illinois Highway Code is specifically directed to . . . taxes authorized by . . . meetings during certain years prior to Public Act 94-692's enactment. . . . [T]hey are intrinsically retroactive.").

The 2006 amendment to the Act does not, on its face, appear to meet Illinois's high standards for retroactivity. There is no express language calling for retroactive application, nor does the amendment contain any provision specifically purporting to make the law applicable to events or actions that took place before its effective date. Illinois nevertheless has advanced several arguments in support of retroactivity, to which we now turn.

**III**

Illinois begins by asserting that the General Assembly never intended simply to forgive the subsidies that buyers like ComEd had received, yet a finding against retroactivity would have precisely that unintended effect for firms like RTC that went bankrupt. The state concedes, however, that the initial step is to determine whether the legislature clearly indicated the statute's temporal reach, and that if it did not, the law is presumed to be prospective. It also acknowledges that in *Caveney*, the state supreme court ruled that courts would seldom if ever have to proceed beyond that first question, because if the particular law did not specify temporal reach, the Statute on Statutes provides the answer. See 797 N.E.2d at 601-02. We grant that it is a fair inference from the 2006 amendments that the legislature wanted to call a halt to a program that was supposed to pay for itself (tax credits up front, reimbursement by Qualified Facilities at the end) but was instead leaving the state with a pile of bad loans. And it is true that new sections (e-5) and (m) indicate that all pre-amendment subsidies are still reimbursable and must be repaid. But the critical question relates to the trigger for the repayment obligation. Before the 2006 amendment, section 8-403.1(d) read as follows:

> Whenever a [Qualified Facility] has paid or otherwise satisfied in full the capital costs or indebtedness incurred in developing and implementing the [Qualified Facility], the [Qualified Facility] shall reimburse the Public Utility Fund and the General Revenue

Fund in the State treasury for the actual reduction in payments to those Funds caused by this subsection (d).

Thus, one and only one trigger for the reimbursement obligation existed: payment in full of the Qualified Facility's capital costs or indebtedness. As amended in 2006, here is how the same section reads:

Whenever a [Qualified Facility] has paid or otherwise satisfied in full the capital costs or indebtedness incurred in developing and implementing the [Qualified Facility], whenever the [Qualified Facility] ceases to operate and produce electricity from methane gas generated from landfills, or at the end of the contract entered into pursuant to subsection (c) . . . whichever occurs first, the [Qualified Facility] shall reimburse the Public Utility Fund and the General Revenue Fund in the State treasury for the actual reduction in payments to those Funds caused by this subsection (d).

The difference is plain. In place of one condition giving rise to the reimbursement obligation, there are now three alternatives: (1) retirement of capital costs or indebtedness; (2) cessation of operations; *or* (3) end of a contract term. Had that language been in place all along, Illinois would have been entitled to press its claim against RTC's bankruptcy estate (or its successor, Chiplease). But it was not.

Illinois nonetheless contends that the amended conditions apply retroactively because the legislature meant for these subsidies to be loans, not gifts. But this does

not get around the Statute on Statutes, nor does it change the fact that RTC's facilities ceased operations before they repaid their capital costs. Unfair though it may be to the state, RTC's Qualified Facilities never will meet the condition obligating them to repay the tax credits until June 2006. Illinois argues that this interpretation of the plan results in an "unreasonable absurdity" that is contrary to the legislature's purpose of providing loans to Qualified Facilities. That may be, but it was the legislature that created a program that gave a tax credit to one party (here, ComEd) that a second party (Chiplease, standing in RTC's shoes) would repay to the state upon the fulfillment of one condition. The fact that the Qualified Facility might never meet that condition, or that it might default on its repayment obligation, does not mean that the terms of the arrangement provided a gift. Any time a loan is made, the lender faces the risk that the borrower may default or fail to meet the repayment conditions. The fact that a borrower fails to repay a loan or takes advantage of a contractual excuse may suggest that the terms of the loan were poorly devised, but it does not transform the money from a loan to a gift.

Illinois also argues that because the two new conditions in amended subsection (d) state that repayment becomes due "whenever" either of the new conditions obtains, those triggers are available no matter when they are met, even if that was a time before the enactment of the 2006 law. The district court properly noted that this argument merely points out that the statute draws no distinction between pre-amendment and post-

amendment events. Failing to distinguish between future and past events is different from expressly applying the new terms to past events.

The state also tries to gain some purchase from the fact that the 2006 amendment added subsections that provide new grounds for disqualifying a power plant from receiving subsidies, but at the same time do not excuse the plant from its repayment obligations. Because these subsections require disqualified facilities to repay their subsidies in accordance with subsection (d), Illinois contends that the repayment conditions added in 2006 must apply retroactively. This does not follow. The requirement that a facility must repay as required by subsection (d) says nothing about whether the facility must repay in accordance with the grounds in effect prior to June 2006 or those in effect thereafter.

Finally, Illinois argues that the amendment must apply retroactively because it was enacted to phase out the failing subsidy program. But this logic is also flawed. From June 2006 onward, Qualified Facilities that cease operating before repaying capital costs are obligated to begin repayment, even though they would not have been under the pre-2006 version. In fact, the state captured some money from Chiplease for the months following June 2006 under the new provisions—funds that it would not have had to pay if the Act had remained unchanged. More facilities will be disqualified under the new grounds in the 2006 amendment, and these additional facilities will also become obligated to repay. All this means is that the amendment has meaningful

effect even if it is understood to be prospective only; it does not help the state's retroactivity argument.

## IV

Because we find that the Act is not retroactive, we need not reach Chiplease's argument that retroactively changing the terms of the loan program would be unconstitutional under the Due Process or Contracts clauses. We AFFIRM the judgment of the district court.