# Illinois Official Reports

## Appellate Court

*In re Civil Union of Hamlin*, 2015 IL App (2d) 140231

| | |
|---|---|
| Appellate Court Caption | *In re* CIVIL UNION OF DEBRA HAMLIN, Petitioner-Appellee and Cross-Appellant, and VICTORIA VASCONCELLOS, Respondent-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket No. 2-14-0231 |
| Filed | July 17, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-D-2248; the Hon. Neal W. Cerne, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Brian A. Schroeder, Jay P. Dahlin, and Michele M. Jochner, all of Schiller, DuCanto & Fleck LLP, of Chicago, for appellant.<br><br>Megan A. McCarthy Hayes, Nicole M. Onorato, and Erin B. Bodendorfer, all of Katz & Stefani, LLC, of Chicago, for appellee. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Hudson concurred in the judgment and opinion.

# OPINION

¶ 1     Following a contested hearing before the circuit court of Du Page County, respondent, Victoria Vasconcellos, and petitioner, Debra Hamlin, received a judgment dissolving their civil union. Pursuant to the judgment of dissolution, the trial court classified certain of the parties' assets as part of the civil-union estate and distributed those assets, allocating $1,259,283 (73%) to respondent and $462,459 (27%) to petitioner. Respondent appeals the judgment, arguing that the trial court erred in classifying certain assets as civil-union property. She contends that, because Illinois first recognized civil unions on June 1, 2011, the effective date of the Illinois Religious Freedom Protection and Civil Union Act (Act) (750 ILCS 75/1 *et seq.* (West 2010)) and because the Act should be given only prospective effect, any previously acquired assets must be classified as non-civil-union property. Petitioner cross-appeals, arguing that the trial court's asset distribution was an abuse of discretion because the main asset of the civil union, Cignot, an electronic cigarette (e-cigarette) vending company founded and run by respondent, was awarded wholly to respondent. Petitioner also argues that the trial court's determination that respondent contributed significantly more to the acquisition of civil-union property, as well as its valuation of Cignot, were against the manifest weight of the evidence. We affirm in part, reverse in part, and remand the cause.

¶ 2                          I. BACKGROUND

¶ 3     We summarize the factual and procedural history pertinent to the issues raised on appeal and cross-appeal. In 1998, the parties met and, by 1999, they had entered into an exclusive dating arrangement. Shortly after beginning their exclusive relationship, petitioner moved into respondent's Poplar Avenue residence in Elmhurst, Illinois. The relationship progressed to the point that, in 2001, the parties became engaged and, in July 2002, they traveled to Vermont where, on July 20, 2002, they legally entered into a civil union. In 2003, same-sex marriages became legally permitted in parts of Canada, and the parties traveled to Toronto and, in July 2003, legally entered into a marriage. Throughout their civil union, the parties resided at the Poplar Avenue residence. No children were born or adopted during the civil union.

¶ 4     Around May 6, 2011, the parties separated. On June 1, 2011, the Act became effective. In August 2011, petitioner filed a petition for dissolution of the parties' civil union, and on July 10, 2012, she filed an amended petition for dissolution. In January 2013, respondent filed her response to the petition and a counterpetition for dissolution. Respondent also claimed that, beginning in May 2011, petitioner had dissipated nearly $14,000 of the civil-union estate on expenses related to petitioner's paramour.

¶ 5     On June 24, 2011, respondent filed a motion for "declaratory judgment," seeking a ruling that, because the Act became effective on June 1, 2011, any property previously accumulated by either party could not be considered civil-union property. Petitioner opposed the motion

with statutory and constitutional arguments, as well as a claim that respondent's position in the motion was contrary to those taken in pleadings in which she denominated certain property accumulated before June 1, 2011, as civil-union property.

¶ 6 The trial court denied respondent's motion. The court ruled that under the text of the Act, civil-union property begins to accrue as of the date of the civil union and not as of the effective date of the Act. The court reasoned that the effective date of the Act was only the date on which Illinois recognized civil unions, whereas the civil union was validly formed when the parties fulfilled the applicable requirements and received a legally executed license in Vermont.

¶ 7 On July 25, 2013, the case proceeded to hearing on the dissolution of the civil union. Petitioner testified that she was 46 years of age at the time of the hearing. She had graduated from Michigan State University and secured employment. In November 1997, she began working at Bridgestone Corporation as a senior environmental engineer, in what she described as a multidisciplinary field involving compliance with and remediation according to environmental regulations. She was promoted within the company and, at the time of the hearing, she held the title of senior environmental projects manager. Also at the time of the hearing, petitioner was earning a base salary of $101,000 supplemented with a discretionary bonus. For the 2012 tax year, petitioner reported $110,536 of gross income.

¶ 8 Respondent, who was 51 years of age at the time of the hearing, had graduated from high school but had not received a college degree. Instead, she became self-employed. Respondent owned and operated a computer-consulting business that did work for various municipalities. Respondent additionally acted as a construction contractor and engaged in various remodeling projects. During the bulk of the civil union, respondent reported average yearly earnings of around $30,000. This picture changed, however, in 2009, when respondent founded Cignot.

¶ 9 In September 2009, respondent incorporated Cignot. She is currently the sole shareholder and is employed by the company. Respondent testified that Cignot proved to be a "gold mine," beginning at the initial upswing of the e-cigarette business. Petitioner sources her products largely from China and sells them via the Internet and at physical locations. The e-cigarette business remained unregulated at the time of the hearing, but regulations were expected to be enacted in the near future. The regulations were expected to have a significant impact on the Internet aspect of Cignot's business, so respondent had opened two physical locations by the time of the hearing and, at the time of this appeal, there are four physical locations. Respondent related that, in 2009, she reported roughly $54,000 in adjusted gross income. In 2010, Cignot's first full year of operation, respondent reported over $736,000, and in 2011 she reported over $745,000. Respondent kept open her computer-consulting business and received a "nominal" amount of income from it, but she received nearly all of her compensation from and devoted nearly all of her time to Cignot.

¶ 10 The parties testified about their responsibilities and efforts during the time the civil union was intact. Both contributed to the payment of the expenses of the civil union, but they also kept some of their financial accounts separate. The parties created a joint checking account, a joint investment account, and a joint credit-card account, all of which were devoted to the expenses of the civil union. They accumulated cash and other investments, which were generally kept separate. Before the hearing, the parties stipulated as to which assets were to be deemed civil-union and non-civil-union. They disputed the classification of other assets including, most significantly, Cignot. The classification of some of the parties' real property was also disputed.

¶ 11 Respondent paid the expenses associated with the Poplar Avenue residence from her personal checking account, into which she deposited income from her employment. According to respondent, she and petitioner agreed that petitioner would not pay rent to live in the Poplar residence, because petitioner, with her salary and benefits through Bridgestone, was expected to fund the parties' retirement. Petitioner testified that she was primarily responsible for household duties, like cutting the lawn, housecleaning, cooking, doing laundry, and grocery shopping. Petitioner testified that she also assisted in remodeling and renovating the Poplar residence. According to petitioner, as the civil union continued she eventually took over the payments for the parties' monthly living expenses of roughly $1,000 per month. The parties shared other expenses, such as those incurred in traveling on vacation.

¶ 12 During the span of the civil union, the parties purchased investment properties. In March 2002, the parties, along with the Kaminskis, their neighbors, purchased a property on Glenview Avenue in Elmhurst. The property was titled solely in petitioner's name, as was the mortgage. Despite the titling and financing, the parties and the Kaminskis had an oral and informal agreement to share equally the purchase price of the property and the proceeds from any subsequent sale. Both the parties and the Kaminskis contributed equally to the down payment, and the mortgage payments were derived from the Glenview property's rental income. In 2006, the Glenview property was subdivided into two separate properties: 198 Glenview and 200 Glenview. In 2008, 198 Glenview was sold and the parties retained 200 Glenview. After the sale of 198 Glenview, petitioner alone paid the real estate taxes and maintenance expenses associated with 200 Glenview. In 2012, 200 Glenview was sold. According to petitioner, the parties and the Kaminskis all agreed that before they all shared the proceeds of the sale petitioner was entitled to reimbursement for paying the taxes and maintenance expenses. However, the sale occurred during the dissolution proceedings, so the proceeds were initially escrowed and then disbursed to the parties as advances on their portions of the civil-union estate (and were used to pay attorney and witness fees). The parties reported that, at the time of the hearing on the dissolution, the Kaminskis had initiated a suit against petitioner to recoup their portion of the proceeds and that they expected that respondent would also be named a party in the Kaminskis' suit. The parties stipulated that the proceeds were civil-union property.

¶ 13 In April 2007, the parties purchased an interest in real estate located on Glade Avenue in Elmhurst. According to petitioner, the parties, particularly respondent, wanted to purchase the property with Annette Cunningham, respondent's sister, to allow respondent's nephew to reside at the property and possibly to develop the property in the future. Thus, petitioner executed a power of attorney to allow respondent to purchase a 50% interest in the Glade property with Cunningham. The mortgages for the property were informally consolidated and petitioner, Cunningham, and respondent's nephew each paid one-third of the mortgages. From June 2011 to February 2012, after petitioner had left the Poplar residence, Cunningham made the mortgage payments for the Glade property. According to petitioner, beginning in February 2012, the mortgage and utility bills for the Glade property were sent to her and she paid those bills from that time forward. Petitioner testified that, when Cunningham reduced her contribution to the expenses associated with the Glade property during the pendency of the dissolution action, petitioner covered the shortfall; respondent did not provide any funds for the Glade property. According to petitioner, the Glade property was underwater at the time of

the hearing. The parties stipulated that their 50% interest in the Glade property was civil-union property.

¶ 14    Respondent was involved in the ownership of a three-flat investment property located on West Olive in Chicago. Originally, respondent invested in the Olive property with another couple. In 2005, when the couple relocated, the parties discussed how to buy out the relocating couple. The parties decided that, rather than petitioner buying the interest, respondent would refinance and use the funds from the refinance to buy out the relocating couple. Petitioner believed that respondent paid the mortgage on the Olive property using the rental income generated by the property. The parties disputed whether it was civil-union property.

¶ 15    In May 2011, petitioner purchased a new residence on Pick Avenue in Elmhurst. Around that time, petitioner moved out of the Poplar residence. The parties stipulated that the Pick property was civil-union property.

¶ 16    The parties disputed whether Cignot was civil-union property. The record shows that, in September 2009, respondent initially funded the incorporation and capitalization of Cignot with funds taken from a home equity line of credit associated with the Poplar residence. Respondent testified that line of credit existed before the civil union. She withdrew funds for various expenses and repaid the funds with income from her employment. Respondent withdrew $27,000 from the line of credit and combined it with funds from other sources to fund the startup of Cignot. In 2009, Cignot repaid the $27,000.

¶ 17    Petitioner testified that respondent started Cignot for two reasons: to provide funds for the parties' retirement and to help a neighbor, Terry, whose spouse had died and who needed a job. At first, Cignot was solely an Internet-based business, and respondent and Terry operated it out of the basement of the Poplar residence. According to petitioner, she helped as needed with the initial startup activities by running errands (approximately once a month), packaging and organizing the inventory and deliveries, and helping out customers who came to the Poplar residence to purchase products. Respondent testified that petitioner was effectively uninvolved with the usual operations of Cignot and that, if she did help out, it was only occasionally and on an *ad hoc* basis. Eventually, Cignot grew out of the Poplar residence basement and, in 2010, it moved into a rental residence across the street. Petitioner testified that she helped to move Cignot and that she set up the new location. Petitioner also testified that she and respondent created the name and the logo for the business together; respondent testified that she created the logo alone.

¶ 18    Cignot grew from a basement-run Internet vendor with two employees into a much bigger enterprise that had two physical locations (four by the end of the hearing) and a $600,000 annual payroll. Cignot moved from 100% Internet sales to 85% Internet and 15% physical.

¶ 19    Each party presented expert testimony on the value of Cignot. Both experts commented on the newness of the industry and the challenges facing it. Both discussed the near certainty that e-cigarettes would come under federal and state regulation and that, when this came to pass, Internet sales could be expressly or effectively prohibited (effectively because nonpostal carriers would not deliver e-cigarettes and the post office demanded some sort of reliable age verification before it would deliver to a customer). However, at the time of the hearing, the anticipated regulatory shoe had not dropped and e-cigarettes remained unregulated, so there were no limitations or prohibitions regarding Internet-based sales of e-cigarettes.

¶ 20    Brian Potter testified as petitioner's expert on the value of Cignot. Potter testified that Cignot had experienced substantial growth from its inception in 2009. In 2010, it had sales of

$2.2 million and net income of $581,000. In 2011, it had sales of $2.8 million and net income of $571,000. In 2012, although sales declined slightly, to $2.6 million, the decline in Internet sales was offset by growth in physical sales. Cignot demonstrated increased efficiency because its net income as a percentage of sales increased. Potter concluded that the stability exhibited in Cignot's sales would continue in at least the short to medium term, notwithstanding the anticipation of federal and state regulations. Potter valued Cignot using a forecasted-earnings approach and opined that, as of March 31, 2013, respondent's 100% ownership interest in Cignot was worth $1,710,000.

¶ 21    Joseph Glawe testified as respondent's valuation expert. He valued Cignot using a net-asset value approach. He anticipated the implementation of regulations to eliminate the Internet component of Cignot's sales in the near term. Glawe opined that sales could continue at physical locations and observed that physical sales were increasing. Based on the uncertain regulatory picture, Glawe presented his valuation as the amount a willing buyer would pay for Cignot's assets on the date of valuation, because it was uncertain that Cignot would continue as a going concern. Glawe opined that Cignot's value, as of December 31, 2012, was $828,000.

¶ 22    On November 7, 2013, the trial court entered a judgment of dissolution of the parties' civil union. The trial court initially held that civil unions, in contrast with same-sex marriages, were not against public policy in Illinois. The court then held that the parties' Vermont civil union was valid as of July 20, 2002, the date on which it was entered into. The court declared the Canadian marriage null and void, because it was a second civil union entered into while the Vermont civil union was valid. Finally, the court held that the parties had satisfied the statutory grounds of irreconcilable differences.

¶ 23    The court proceeded to consider the division of property and whether maintenance was warranted, pursuant to sections 503 and 504 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution of Marriage Act) (750 ILCS 5/503, 504 (West 2012)). The court noted that, "until recently, [petitioner] earned a greater income than [respondent] during their Civil Union." Respondent, "an entrepreneur," "started Cignot, Inc.," the future of which was "highly speculative." The court determined that the parties kept their incomes separate and equally shared the expenses of the civil union while they individually paid their own personal expenses. The court determined that, during the civil union, neither party acted as a stay-at-home homemaker and they shared the responsibility for maintaining the home. Significantly, the court determined that "[t]he fact that each party had their own careers and that [petitioner] had a pension created a 'safe' environment for [respondent] to undertake a substantial [home equity line of credit] for the start of a new business." The court further held:

    "The parties, by entering into a Civil Union, obviously had the intention that their relationship was more than a financial arrangement. Otherwise, there would be no purpose to the Civil Union. Their contributions to the arrangement went beyond the finances of the Union, and those contributions must have value. To argue that each party keep whatever they earned would be akin to treating them as two strangers sharing an apartment lease. That is not what occurred here. They intended to be more than a partnership and that cannot be ignored, even if their contributions beyond finances are difficult to identify or value."

¶ 24    The court held that respondent contributed significantly more to the acquisition of assets during the civil union, the bulk of which was embodied by Cignot. Specifically, the court held that Cignot's success was "the result of [respondent's] efforts. While [petitioner] may have

made some contribution, her contribution is significantly less than that of [respondent]. [Respondent] devoted her full effort while [petitioner] maintained her full time employment with Bridgestone."

¶ 25 As Cignot represented the majority of the parties' assets, the trial court devoted particular attention to it. The trial court held that the fair market value of Cignot was its book value of $1,212,750, which was determined by adding up all of Cignot's cash on hand at the time of the hearing. The court explained that Cignot had experienced "a significant volume of sales during its very short history." With that said, the court noted:

"There are significant, legitimate, concerns that the FDA will attempt to regulate electronic cigarettes, and that major tobacco companies will enter the market. Both of these situations are significant risks to the future viability of Cignot. The FDA may determine that [e-cigarettes] are a health risk and regulate them as they do tobacco products. This would severely impact the marketing of the product as a safe alternative to tobacco. Large tobacco companies have the established brand names that they could use for the electronic cigarette, and the ability to manufacture their own product (Cignot buys the product from a manufacturer)."

¶ 26 Based on the foregoing analysis, the court rejected petitioner's method of valuation, because the "limited amount of historical data and the significant unknown position of the FDA" made the forecasted-earnings method of valuation "completely unreliable." Instead, respondent's method of valuation, relying on the book value of the business, was "much more persuasive." The trial court also concluded that Cignot was civil-union property.

¶ 27 The trial court designated the parties' other assets as either civil-union or non-civil-union property. The trial court held that the Poplar residence was non-civil-union property. The court then proceeded to divide the property. Significantly here, the court awarded the entirety of Cignot to respondent, awarded the Glade property to petitioner, and required respondent to make a $75,000 payment to petitioner. The court awarded respondent $1,259,283 of the civil-union estate and petitioner $462,459 of the civil-union estate; in other words, respondent received 73% and petitioner received 27%. In addition, respondent's non-civil-union assets totaled $128,596, and petitioner's totaled $54,983. The parties' non-civil-union assets appeared to be illiquid. The parties were ordered to bear their own attorney fees, and maintenance was barred to both parties.

¶ 28 Both parties timely filed motions to reconsider. On January 7, 2014, the trial court heard argument on the motions. Pertinent here, the parties challenged the division of civil-union assets and the classification of Cignot as a civil-union asset. The trial court explained its reasoning regarding the division of assets and how its valuation of Cignot played into that division:

"I'm supposed to divide the property pursuant to [the factors listed in the] statute. ***

*** I'm supposed to look to the contributions. One of the factors is I'm supposed to look to the contributions of the parties. Okay. [Petitioner] was working at a separate job earning a full-time wage. She did not put in a significant amount of actual effort to Cignot. I think that was uncontroverted. Okay. That's a factor that goes in my mind the idea that should be disproportionately divided. In addition, I guess I'm not sure if I said this in the judgment or not. The value of the assets. That's a difficult issue, I think. I

think because your position and the position I took was that I took Cignot and I in essence took its cash value. I understand that. But on the other hand, you know, I'm not so sure if it's really worth this cash value even though I said it because cash is cash, but if money is being [held] for contingent liabilities or liabilities that are expected, and I think it was reasonably presumed that those liabilities were going to come into existence in the future with regards to the FDA and maybe they would be shut down and highly contingent and I agree, it's hard to value what that is, but even though I can't put a value on that, and I'm not even sure,–I can't say it necessarily [a]ffects–it certainly [a]ffects it. So to say that it was divided 73/23 [*sic*]. Okay. In one way I guess it was, but on the other hand, those are risky assets, aren't they? I mean aren't they subject to loss? That's kind of an issue I'm having. That's a hard issue."

¶ 29      As the hearing proceeded, petitioner focused on the court's award of Cignot wholly to respondent. Petitioner argued that there are virtually no cases in which the marital or civil-union assets were divided nearly three-quarters to one-quarter and that those that approached such a division had special circumstances not present here. Responding to this concern, the court explained:

"The facts in this case were so unusual. I think that's why it's hard to find any cases that are even similar is because you had some company that frankly was a fluke and the ending years of this marriage or union that just took off. And had some issues in the future. And you have a situation where one party really didn't contribute anything to that flukiness or that I don't think anyone anticipated that this thing was going to take off like it did. But you have one party who's completely in my mind responsible for the operation of that business, and so I agree, there aren't any cases that are similar to that where you have one spouse who has nothing to do with the company. And it occurs right at the end of the union. Not at the beginning of the union, not in the middle of the union, but gosh darn, right at the end. So there really was minimal contribution to it. I think–I don't,–I think your position hangs up, gets hung up too much on the percentage because the statute says nothing about percentages. It says nothing about equally dividing these. It doesn't even say you start from an equal position and move off of it. It doesn't say that.

\*\*\*

It says that you look at the factors that go into it. And to say that this company has so much money. I mean,–you know the other unusual thing is a lot of this–. Yeah, it had a lot of money into it, you know, but it was decided that that money not be paid out as salary either. The money was purposely kept in for all these contingent liabilities that everyone agreed are realities."

¶ 30      The court denied the substantive relief sought in both parties' motions to reconsider. Respondent timely appeals and petitioner timely cross-appeals.

¶ 31                              II. ANALYSIS

¶ 32      On appeal, respondent argues that the Act should be given prospective application only, from its effective date of June 1, 2011. According to respondent's implicit definition of prospectivity, if the Act applies only prospectively, then civil-union property accrued only

from June 1, 2011, and thereafter, meaning that Cignot and the Olive property would both be non-civil-union property.

¶ 33 On cross-appeal, petitioner argues that the trial court's division of civil-union property was an abuse of discretion. Petitioner also argues that the trial court's determinations leading to the division of property were against the manifest weight of the evidence. Specifically, she disputes the court's determination that respondent contributed significantly more to the accumulation of civil-union property and the court's division of Cignot based upon the perceived riskiness of the asset. We consider the issues raised by the parties in turn.

¶ 34                                    A. Respondent's Appeal

¶ 35 On appeal, respondent contends that Cignot and the Olive property are both non-civil-union property and that the trial court erred in classifying them as civil-union property. Respondent argues that the Act's effective date of June 1, 2011, is the date from which civil-union property began to accrue, and that, because Cignot and the Olive property were obtained before the Act's effective date, they are non-civil-union property. To reach this result, respondent argues that the Act should be given only prospective application under the applicable legal principles. In order to evaluate respondent's argument, we begin with the pertinent language of the Act itself.

¶ 36 The Act provides that it "shall be liberally construed and applied to promote its underlying purposes." 750 ILCS 75/5 (West 2010). The purposes of the Act "are to provide adequate procedures for the certification and registration of a civil union and provide persons entering into a civil union with the obligations, responsibilities, protections, and benefits afforded or recognized by the law of Illinois to spouses." *Id.* The Act further discusses the protections and responsibilities it affords: "A party to a civil union is entitled to the same legal obligations, responsibilities, protections, and benefits as are afforded or recognized by the law of Illinois to spouses, whether they derive from statute, administrative rule, policy, common law, or any other source of civil or criminal law." 750 ILCS 75/20 (West 2010).

¶ 37 The Act expressly discusses dissolution of a civil union:

"Any person who enters into a civil union in Illinois consents to the jurisdiction of the courts of Illinois for the purpose of any action relating to a civil union even if one or both parties cease to reside in this State. A court shall enter a judgment of dissolution of a civil union if at the time the action is commenced it meets the grounds for dissolution set forth in Section 401 of the Illinois Marriage and Dissolution of Marriage Act. The provisions of Sections 401 through 413 of the Illinois Marriage and Dissolution of Marriage Act shall apply to a dissolution of a civil union." 750 ILCS 75/45 (West 2010).

Finally, and most pertinently here, the Act provides for reciprocity with other jurisdictions: "A marriage between persons of the same sex, a civil union, or a substantially similar legal relationship other than common law marriage, legally entered into in another jurisdiction, shall be recognized in Illinois as a civil union." 750 ILCS 75/60 (West 2010).[1]

_____

[1]Recently, section 60 of the Act was amended by adding a second sentence: "A marriage, whether of the same sex or different sexes and providing that it is not a common law marriage, legally entered into in another jurisdiction, shall be recognized in this State as a marriage in accordance with the provisions of the Illinois Marriage and Dissolution of Marriage Act, except that Section 216 of the

¶ 38    We now turn to the principles of statutory interpretation. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *In re Application of the County Treasurer & ex officio County Collector*, 2014 IL App (2d) 130995, ¶ 11. The legislature's intent is best determined by considering the plain and ordinary meaning of the statute's language; further, the reviewing court considers the statute in its entirety, the subject it addresses, and the legislature's apparent intent in enacting the statute. *Id.* If the statutory language is clear and unambiguous, the court must give effect to it without using other aids of construction. *Id.* ¶ 12. Finally, an issue of statutory interpretation presents a question of law, and we review it *de novo. Hooker v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2013 IL 114811, ¶ 15.

¶ 39    Respondent argues that the trial court erred in giving the Act retroactive application. Instead, according to respondent, in Illinois, any accumulation of civil-union property should be measured from the Act's effective date. Respondent concludes that the Act should thus be given only prospective application.

¶ 40    In *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the United States Supreme Court set forth a retroactivity analysis that our supreme court adopted in *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27 (2001). Our supreme court further refined the retroactivity analysis in *Caveney v. Bower*, 207 Ill. 2d 82 (2003). In *Caveney*, our supreme court noted that the *Landgraf* analysis had two steps. First, the court had to determine whether the legislature had clearly indicated a temporal reach in a new or an amended statute. *Id.* at 91. If the legislature had indicated a temporal reach, then, absent a constitutional prohibition, the expression of legislative intent was to be given effect. *Id.* Second, if there was no indication of a temporal reach in the new statute or amendment, then the court was required to determine whether applying the statute would have a retroactive impact, meaning whether the application of the statute would: (1) impair rights a party possessed when it acted; (2) increase a party's liability for past conduct; or (3) impose new duties with respect to already completed transactions. *Id.* If there was no retroactive impact, the new statute or amendment could be applied retroactively; if there was a retroactive impact, then the court was to presume that the legislature did not intend the new statute or amendment to be applied retroactively. *Id.* Our supreme court further noted that, importantly, section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2000)) clearly set forth the temporal reach of every new statute or amendment, so, if the new statute or amendment did not itself clearly state whether it was to be applied retroactively, then section 4 of the Statute on Statutes would provide the express temporal reach. *Caveney*, 207 Ill. 2d at 92. Thus, our supreme court determined that, pursuant to section 4, if the new statute or amendment were procedural, it would be applied retroactively, but, if it were substantive, then it would be applied prospectively. *Id. Caveney* thus held that the application of the *Landgraf* analysis would almost never proceed past the first step, because, even if the new statute or amendment did not itself specify a temporal reach, section 4 provided the missing temporal reach. *Id.* at 94. With these principles in mind, we look to the language of the Act to determine if the legislature clearly specified a temporal scope.

---

Illinois Marriage and Dissolution of Marriage Act [(forbidding the recognition of same-sex marriages)] shall not apply to marriages of same-sex couples validly entered into in another jurisdiction." Pub. Act 98-597, § 915 (eff. June 1, 2014) (amending 750 ILCS 75/60 (West 2012)).

¶ 41    Strikingly, the sections of the Act that seem to bear upon the question of prospectivity versus retroactivity, namely, sections 5, 20, 45, and 60 (750 ILCS 75/5, 20, 45, 60 (West 2010)), are actually devoid of words expressly delimiting its temporal scope. Section 45, however, specifically incorporates the provisions of the Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2010)) as the provisions for dissolving a civil union. Notably, section 45 states that a "court shall enter a judgment of dissolution of a civil union if at the time the action is commenced it meets the grounds for dissolution set forth in [the Dissolution of Marriage Act]." 750 ILCS 75/45 (West 2010). The necessary implication, then, is that parties seeking a dissolution could have been in a civil union that predated the effective date of the Act. In other words, parties to a foreign civil union that predated the Act could have sought a dissolution on the effective date of the Act without the need to first fulfill the various conditions precedent for residency and separation that would be required if the civil union were deemed effective only on the effective date of the Act. See 750 ILCS 5/401 (West 2010). With that said, however, section 60 is the key section for purposes of respondent's appeal. We consider that section next.

¶ 42    Section 60 of the Act expressly discusses reciprocity: "A marriage between persons of the same sex, a civil union, or a substantially similar legal relationship other than common law marriage, legally entered into in another jurisdiction, shall be recognized in Illinois as a civil union." 750 ILCS 75/60 (West 2010). This provision directly covers the issue here: the date from which the parties' foreign civil union will be recognized as valid. "A marriage," "a civil union," and "a substantially similar legal relationship" are collectively the subjects of section 60. *Id.* "[M]arriage" is modified by the prepositional phrase, "between persons of the same sex." *Id.* "[S]imilar legal relationship" is modified by the prepositional phrase, "other than common law marriage." *Id.* The compound subject of the sentence "marriage between persons of the same sex," "civil union," and "similar legal relationship other than common law marriage" is modified by the appositive adjectival phrase, "legally entered into." *Id.* Finally, the adjectival phrase is itself modified by the prepositional phrase, "in another jurisdiction." *Id.* The compound subject is operated upon by the compound verb, "shall be recognized." *Id.* The verb is further modified by the adverbial phrases, "in Illinois," and "as a civil union." Thus, the compound subject is a foreign, legal, same-sex marriage, civil union, or other similar relationship, which shall be recognized in Illinois as a "civil union." *Id.* In other words, restating section 60 to fit the precise circumstances of this case: "A *** civil union, *** legally entered into in another jurisdiction, shall be recognized in Illinois as a civil union." *Id.*

¶ 43    Restating section 60 confirms our grammatical analysis. If the parties legally entered into a civil union in another jurisdiction, then, by operation of section 60, it shall be recognized in Illinois as a civil union, notwithstanding the parties' genders. The only requirement is that the civil union was legally entered into in that foreign jurisdiction. There is no temporal limitation placed upon the civil union. *Id.* This means that the civil union could predate the effective date of the Act, match the effective date of the Act, or postdate the effective date of the Act. Again, the singular requirement is that the civil union was legally entered into in the foreign jurisdiction.[2] *Id.* Thus, we hold that section 60 operates to recognize, as of the Act's effective date, any civil union that was, at any time, legally entered into in a foreign jurisdiction.

---

[2]The same analysis applies to a "same-sex marriage" and a "similar legal relationship." However, in this case, confining our analysis to a "civil union" is sufficient.

¶ 44    Respondent posits that the recent case of *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, supports her view of "prospectivity" and a "prospective" application of the Act that synchronizes the effective date of the Act with the accrual of civil-union property, no matter when the civil union was legally entered into in another jurisdiction. We disagree in part. *Hayashi* supports a determination that the Act is prospective, but it does not support respondent's view of prospectivity.

¶ 45    In *Hayashi*, the issue presented was the temporal effect of an amendment to section 2105-165 of the Department of Professional Regulation Law (Regulation Law) (20 ILCS 2105/2105-165 (West 2012)). *Hayashi*, 2014 IL 116023, ¶ 14. The amended provision stated that, when a licensed health-care worker " 'has been convicted of' " an enumerated offense, " 'the license of the health care worker shall by operation of law be permanently revoked without a hearing.' " (Emphasis omitted.) *Id.* ¶ 15 (quoting 20 ILCS 2105/2105-165(a) (West 2012)). The supreme court held that "the legislature intended [the amended provision] to apply to convictions predating its effective date." *Id.* ¶ 17. In reaching this holding, the court employed a grammatical analysis of the provision. *Id.* The court rejected the plaintiffs' position, noting that the Regulation Law's "plain language clearly indicate[d] the legislative intent to subject persons to the Act without regard to the date of their convictions." *Id.* ¶ 18.

¶ 46    *Hayashi* then analyzed whether the Regulation Law, in applying to conduct occurring before the effective date of the amendment, was retroactive. The court reasoned that the Regulation Law operated "only after its effective date" and was therefore "solely prospective" in its operation. *Id.* ¶ 24. Notably, the court emphasized that " '[a] statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, [citation], or upsets expectations based in prior law.' " *Id.* ¶ 25 (quoting *Landgraf*, 511 U.S. at 269). The court further reasoned that, even though the Regulation Law relied on antecedent facts for its operation, it did not operate retroactively on those facts, because it did not reach back in time and change the penalties associated with the antecedent facts or make then-lawful conduct unlawful. *Id.* ¶ 26. The court concluded that "[a]n amended statute which creates new requirements to be imposed in the present or future, and not in the past, does not have a retroactive impact on the parties," and it held that the Regulation Law was "solely prospective and not impermissibly retroactive within the meaning of the [*Landgraf*] test." *Id.*

¶ 47    We find *Hayashi*'s analysis of the operation of the Regulation Law to be particularly instructive in determining the temporal effect of the Act in this case. The Act is effective as of its effective date: on that date and thereafter, Illinois recognizes same-sex civil unions. However, on that date and thereafter, Illinois recognizes all civil unions "legally entered into," even those entered into before that date. 750 ILCS 75/60 (West 2010); see also *Hayashi*, 2014 IL 116023, ¶ 26. That a civil union was "legally entered into" before the Act's effective date is an antecedent fact, of the same type as the convictions in *Hayashi*, on which the Act operates. *Id.* Thus, the Act is prospective, because it operates only as of its effective date, and thereafter, but it operates on civil unions that were legally entered into before, on, or after that effective date. See *id.* ¶¶ 25-26 (a statute is not retroactive because it is applied to facts arising from conduct occurring before the statute's effective date; if the statute does not reach back in time and apply to historical conduct, it is not retroactive even if it operates on those historical facts). Accordingly, we hold that, as of the Act's effective date, Illinois recognizes any civil union

that was legally entered into in another jurisdiction as valid from the date on which that civil union was actually entered into.

¶ 48    Respondent attempts to interpret *Hayashi* so as to jibe with her view of prospectivity, namely, that any civil union antedating the Act's effective date will be deemed to be entered into only on that effective date. We find no support in *Hayashi* for such an interpretation. *Hayashi* clearly notes that, simply because a statute operates on an antecedent fact, the statute is not rendered retroactive. So too with the Act. A civil union must only have been legally entered into. If so, then it shall be recognized in Illinois as a civil union, valid from the date on which it was entered into. There is no dispute that the parties legally entered into their Vermont civil union in 2002. Accordingly, under section 60 of the Act, their civil union must be given effect as of the date on which it was entered into; it "shall be recognized" in Illinois as of the effective date of the Act (*i.e.*, prospectively), meaning that the provisions of the Act apply to the civil union as of the effective date. See *id.* ¶¶ 24-26.

¶ 49    Respondent argues that recognition of the parties' civil union should be "prospective" in that recognition should not extend to any antecedent facts, including the date on which the civil union was entered into. According to respondent, the legislature "intended for the Act to apply to civil unions entered into before the Act's effective date, but the [legislature] intended to recognize such civil unions only as of the Act's effective date." In other words, respondent attempts to interpret *Hayashi* as directly supporting her belief that prospective application of the Act means that it both will operate on and after its effective date and will treat any civil union antedating that date as having been entered into on that date. This view flatly contradicts *Hayashi* and misreads the Act. The Act's singular limitation on a civil union is that it be legally entered into. Respondent interprets the Act to further limit a civil union by deeming the relationship as having been entered into only as of the effective date of the Act. The Act does not limit the effect of a foreign civil union to the effective date of the Act and thereafter. *Hayashi* does not require such a limitation, as it held that the antecedent facts on which a statute operates do not render the statute retroactive. Thus, we reject respondent's view of *Hayashi*.

¶ 50    Respondent argues that recognizing their civil union as commencing in 2002 means that we are giving retroactive application to the Act. We disagree. As we have determined, the Act operates only as of its effective date. Thus, it is prospective. However, the Act may operate upon antecedent facts, such as the fact that a civil union was entered into before the Act's effective date. Here, the original petition for dissolution of the civil union was filed in August 2011, after the effective date of the Act. There is no question that the Act was effective as of the filing and could operate on the parties' civil union, despite the fact that it antedated the Act's effective date.

¶ 51    Respondent contends that the Act created new substantive rights and must be given prospective application even as to the validity of the civil union. We need not worry about whether the Act is creating substantive rights, because, in any event, it is being applied prospectively. Respondent appears to confuse the existence of antecedent facts on which the Act will operate with the Act's prospective operation. Nevertheless, we will attempt to address respondent's argument on its terms.

¶ 52    According to respondent, if we deem that their civil union commenced in 2002, then property that would have been deemed non-civil-union property will be converted to civil-union property by operation of the Act. This argument is contradicted by the plain

language of section 60 of the Act, which states that a civil union "legally entered into in another jurisdiction, shall be recognized in Illinois as a civil union." 750 ILCS 75/60 (West 2010).

¶ 53    Indeed, our supreme court has already decided this argument, albeit in the context of the implementation of the then-new Dissolution of Marriage Act. See *Kujawinski v. Kujawinski*, 71 Ill. 2d 563 (1978). The petitioner argued that the classification scheme, designating certain property obtained during the marriage as "marital property," disturbed his vested ownership rights in the property. *Id.* at 571. The supreme court rejected this argument, holding that the Dissolution of Marriage Act "does not purport to affect property interests during the marriage." *Id.* at 573. Instead, "[t]he term 'marital property' is a nomenclature devised to realize an equitable distribution of property upon termination of the marriage. Operation of the term 'marital property' under the [Dissolution of Marriage] Act is not triggered until the time of dissolution." *Id.* Likewise here. The designation of property as civil-union and non-civil-union does not affect the accumulation or ownership of the property during the life of the civil union, but that designation is triggered only upon the dissolution of the civil union. See *id.* There is no retroactive application of the Act. See *id.*

¶ 54    Respondent argues that the Act is substantive because it "created an entirely new legal relationship between individuals that never before existed in Illinois." While this might be true, in light of section 60 it is of less significance than respondent argues. As of its effective date, the Act operates to create the civil-union status in Illinois, but section 60 recognizes a civil-union status that was legally entered into in another jurisdiction as of the date on which that relationship was created, even if it predates the Act's effective date. 750 ILCS 75/60 (West 2010); *Hayashi*, 2014 IL 116023, ¶ 24. Accordingly, even if we credit respondent's contention that the Act is substantive, it is being applied prospectively even as it recognizes the existence of legal civil unions that predate its effective date.

¶ 55    Respondent argues that the Olive property is non-civil-union because it was obtained before the effective date of the Act. Respondent argues not that the Olive property was purchased with non-civil-union funds, but only that it was obtained before the effective date of the Act, which she believes should constitute the starting point for the accrual of civil-union property. As we have rejected the underlying premise of this contention, we also reject this contention.

¶ 56    Respondent also argues that an Edward Jones account and Cignot were similarly erroneously classified as civil-union property because these assets were created before the effective date of the Act. As we have rejected the underlying premise of these contentions, we also reject these contentions.

¶ 57    Respondent argues that the trial court erred in relying on the Act's full-faith-and-credit clause to give the Act retroactive application. According to respondent, Illinois public policy rejected civil unions until the effective date of the Act. This argument again overlooks the plain language of section 60 of the Act, which clearly limits the recognition of a civil union only to one which was "legally entered into," with no further temporal limitations expressed or fairly implied. Thus, the public policy in Illinois was to allow civil unions by operation of the Act as of the Act's effective date, but also, for purposes of the operation of the Act, to recognize those civil unions that predated the Act's effective date. Accordingly, we reject respondent's contention.

¶ 58    In light of the foregoing analysis, we need not address respondent's arguments regarding the propriety of certain of petitioner's arguments. Likewise, we need not consider petitioner's arguments supporting the propriety of the trial court's ruling, as we have determined that the trial court correctly held that the parties' civil union commenced on the date it was entered into and not on the effective date of the Act. Having upheld the trial court's ruling on that point, we now turn to petitioner's cross-appeal.

¶ 59                                B. Petitioner's Cross-Appeal

¶ 60    On cross-appeal, petitioner argues that the trial court's division of the civil-union estate, awarding 73% to respondent and 27% to petitioner, constituted an abuse of discretion. She also challenges the court's determinations leading up to the property distribution. First, petitioner contends that the trial court's determination that respondent contributed significantly more to the acquisition of civil-union property was against the manifest weight of the evidence. Petitioner also contends that the court's valuation and distribution of Cignot were erroneous because the court relied upon its perception of the risk associated with future regulation of the industry. Based on these errors, petitioner concludes, the court's ultimate distribution of the civil-union estate was an abuse of discretion.

¶ 61    We begin by again noting that the Act expressly incorporates the Dissolution of Marriage Act's provisions into the dissolution of a civil union. 750 ILCS 75/45 (West 2010). Thus, in accordance with the Dissolution of Marriage Act, the court is required to divide the civil-union estate "in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2010). These factors include, pertinently, each party's contribution to acquiring, preserving, or increasing or decreasing the value of civil-union or non-civil-union property; each party's dissipation of civil-union assets; the value of the property assigned to each party; the duration of the civil union; each party's economic circumstances upon the division of property; each party's age, health, occupation, amount and sources of income, vocational skills, employability, liabilities, and needs; whether the property division is instead of or in addition to maintenance; each party's prospects for the future acquisition of assets and income; and the tax consequences of the property division. *Id.* The court's focus in effecting a property distribution is whether the distribution is equitable, and each case rests on its own facts. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. An equitable property division does not necessarily mean an equal distribution; a party may receive a greater share of the property if the relevant factors warrant the result. *Id.* When reviewing a trial court's property distribution, the reviewing court applies the manifest-weight-of-the-evidence standard to the trial court's factual findings on each of the factors it used in making its property distribution, but it applies the abuse-of-discretion standard in reviewing the trial court's total property distribution. *Id.*

¶ 62    We first consider petitioner's claim that the trial court's determination that respondent contributed significantly more to the acquisition of civil-union property was against the manifest weight of the evidence. The trial court noted that Cignot, valued at $1.2 million, constituted the great majority of the civil-union estate. The trial court further held that it was primarily through respondent's efforts that Cignot was founded and became successful. The trial court also noted that petitioner had little involvement with Cignot because she maintained her full-time employment with Bridgestone while Cignot was created and operated by respondent and their neighbor.

¶ 63    While we do not fault the trial court's factual findings insofar as they barely recount these facts, we note that the court's factual findings give notably short shrift to the idea that the parties' civil union represented a partnership. We note that the trial court expressly held:

> "The parties, by entering into a Civil Union, obviously had the intention that their relationship was more than a financial arrangement. Otherwise, there would be no purpose to the Civil Union. Their contributions to the arrangement went beyond finances of the Union, and those contributions must have value. To argue that each party keep whatever they earned would be akin to treating them as two strangers sharing an apartment lease. That is not what occurred here. They intended to be more than a partnership and that cannot be ignored, even if their contributions beyond finances are difficult to identify or value."

¶ 64    In fact, in finding that petitioner did not contribute to Cignot because she maintained her full-time employment, the trial court overlooked a purpose of petitioner's full-time employment, which was to provide a safe environment to allow respondent to take the entrepreneurial risk of creating and running Cignot. Indeed, the trial court expressly noted that petitioner's full-time employment "created a 'safe' environment for [respondent] to undertake a substantial [home equity line of credit] for the start of a new business." We cannot reconcile the trial court's recognition that the parties created a partnership in entering into their civil union and that petitioner's contribution to the union included maintaining full-time employment that provided respondent with a safe environment in which to take entrepreneurial risks with its conclusion that respondent contributed significantly more to the acquisition of civil-union property. This runs directly counter to its acknowledgment that the parties' "relationship was more than a financial relationship, *** even if their contributions beyond finances are difficult to identify or value." Instead, the trial court reverted to a wholly financial yardstick in viewing the parties' contributions to the acquisition of civil union property.

¶ 65    We see this in another fashion as well. For the first seven years of the civil union, from 2002 to 2009, petitioner far outearned respondent. It was only with the success of Cignot that respondent, in 2010 and 2011, earned more than petitioner. Thus, although when respondent reached her earnings bonanza she far outperformed petitioner in earnings, for the bulk of the civil union petitioner outperformed respondent. The trial court did not even acknowledge these events, focusing instead on the valuation of Cignot as the sole measure of what each party contributed to the acquisition of civil-union property. Under both of these views, we believe that the trial court ignored significant realities in the nature of the parties' relationship and their responsibilities within the context of the civil union. Based on the foregoing, we hold that the trial court's determination that respondent contributed significantly more to the acquisition of civil-union property was against the manifest weight of the evidence. This is not to say that the parties' contributions were exactly equal, only that, based on all of the evidence, as well as on the trial court's own determinations, we cannot say that respondent contributed *significantly* more to the acquisition of civil-union property. The relative contributions of the parties might justify a disproportionate distribution of a civil-union asset or of all of the assets, but the relative contributions of the parties does not support awarding Cignot wholly to respondent.

¶ 66    Respondent argues that the trial court properly determined that petitioner played no meaningful role in Cignot's operations. We agree that this factual determination was not against the manifest weight of the evidence. However, that fact is not dispositive in

determining whether, similarly, petitioner contributed significantly less to the acquisition of civil-union property. The evidence showed that the parties agreed that petitioner would maintain full-time employment in order to create the necessary cushion to allow respondent to embark on the entrepreneurially risky endeavor of founding and operating Cignot. Thus, the fact that petitioner was not meaningfully involved in Cignot's operations does not mean that petitioner was not meaningfully involved in the acquisition of civil-union property. Respondent's contention is essentially a straw man and is wide of the mark.

¶ 67    Next we turn to petitioner's contention that the trial court improperly valued and distributed Cignot based on its perception of risk to the future viability of Cignot. The trial court explained that it valued Cignot by considering all of the cash on hand at the time of trial, even though most of that cash was earmarked for contingent liabilities if the FDA did establish regulations for the e-cigarette industry. However, at trial and during the hearing on the motion to reconsider, the evidence was uncontroverted that no regulations had been enacted and that the large tobacco companies had not yet entered the e-cigarette market in a significant way. Accordingly, while the valuation might be supportable because cash is cash, in distributing the asset the court appeared to use its perception of the future risk Cignot faced.

¶ 68    Accordingly, petitioner contends that the trial court's distribution of Cignot wholly to respondent, based on the perceived risk, was erroneous. We find substantial force to that argument. Generally, if a large asset is awarded to one party, an equitable distribution may be made by requiring the party to make an offsetting payment to the other party. *In re Marriage of Charles*, 284 Ill. App. 3d 339, 345 (1996). Here, the trial court awarded respondent all of Cignot, yet it required only a $75,000 payment from respondent to petitioner so that petitioner could pay her attorneys. We do not believe that this effected an equitable distribution of the civil union's largest asset.

¶ 69    Respondent argues that the trial court was justified in considering the risk to Cignot's future operations that potential governmental regulation posed. We agree that the trial court could have considered this factor in valuing Cignot. The trial court did not, however, appear to consider future risk as a factor in valuing Cignot; instead, it based its valuation on the present cash on hand, and respondent does not claim error based upon this valuation methodology. Further, respondent does not challenge petitioner's contention that the risk posed by impending regulation should not have been a factor in the distribution of the asset. Accordingly, on balance, we agree with petitioner's contentions that the trial court's factual findings about the acquisition of civil-union property and the distribution of Cignot based on perceived risk were erroneous.

¶ 70    Last, petitioner argues that the ultimate distribution of civil-union assets, awarding 73% to respondent and 27% to petitioner, was an abuse of discretion. The trial court explained that it considered the factors set forth in section 503(d) of the Dissolution of Marriage Act as to each asset before deciding to whom the asset should be awarded. Above, however, we noted that the trial court's determination that petitioner contributed significantly less than respondent to the acquisition of civil-union property was against the manifest weight of the evidence. Further, the trial court erroneously believed that petitioner effectively contributed nothing to Cignot. While it is true that petitioner did not much participate in the creation and operation of Cignot, she still contributed to its creation and success by maintaining her full-time employment with Bridgestone, earning a steady salary and benefits, thereby allowing respondent to take the entrepreneurial risk in creating Cignot. This is certainly a non-zero contribution to Cignot,

although it might be difficult to value. We observe that, while petitioner's contribution is non-zero, it might also be less than respondent's contribution, so a disproportionate distribution of the asset might be warranted. However, we believe that the court abused its discretion by assigning no value to petitioner's contribution to Cignot and in awarding the entire asset to respondent.

¶ 71 Respondent argues that the trial court's property distribution was not an abuse of discretion. However, she identifies nothing in the record that controverts the evidence that petitioner maintained her employment and benefits in order to allow, at least in part, respondent to take chances in starting a new business. She also identifies nothing that justifies the trial court's failure to consider petitioner's earnings disparity with respondent for the first seven years of the civil union in determining each party's relative contribution to acquiring civil-union property. Accordingly, we hold that the trial court abused its discretion in distributing the civil-union property and we reverse the distribution and remand for the trial court to reallocate the civil-union property equitably in accordance with this opinion.

¶ 72                                    III. CONCLUSION

¶ 73 For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

¶ 74 Affirmed in part and reversed in part; cause remanded with directions.